## The Commonwealth ex relat. WITMER against The Commissioners of Lancaster County.

*Lancaster, Saturday, May 29.*

ON the 17th of this month, *C. Smith* on behalf of *Abraham Witmer*, obtained a rule on the commissioners of *Lancaster* county, to shew cause why a *mandamus* should not issue against them, to compel them to make out an order on the treasurer of the said county in favour of *Witmer* for 58,444 dollars 44 cents, the amount of the valuation of his stone bridge over the river *Conestoga*.

The Supreme Court may issue a *mandamus* in any of the Districts, notwithstanding the act of 24th *Feb.* 1806, prohibits that Court from trying issues of fact in Bank; because as the return to the *mandamus* must be received as true, until proved to be false in an action for a false return which may be brought in some other court, the Supreme

The commissioners shewed for cause a variety of matters, two only of which it is material to state. 1. That this Court had no jurisdiction, the writ of *mandamus* being in its nature an original action, which could only issue from a Court having original jurisdiction, and this Court had

Court may proceed to the end of the *mandamus*, without trying any fact.

A *mandamus* is not a *civil case* within the 19th section of the act of 24th *February* 1806, the intent of that section being, to take away the original jurisdiction in *civil actions*, of which the inferior Courts had jurisdiction, and not to take it away in cases of *mandamus* and the like, of which those Courts had no jurisdiction.

The Court will not grant a *mandamus* to the County Commissioners to draw an order upon the treasury, if there is no money in the treasury to pay it.

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

no original jurisdiction of any civil case in this district, nor could it try the issue of fact which might grow out of the return. 2. That the treasurer had not in his hands any sum of county money equal to the sum for which the order was prayed.

*C. Smith* and *Hopkins* for the relator.

*Rogers* and *Duncan* contra.

TILGHMAN C. J. A rule having been granted on the commissioners of *Lancaster* county, to shew cause why a *mandamus* should not issue, commanding them to draw an order on the treasurer of the said county, in favour of *Abraham Witmer*, for 58,444 dollars 44 cents the amount of the valuation of the stone bridge over the river *Conestoga*, the commissioners appeared, and shewed cause upon which we are now to decide.

On the 22d *September* 1787, an act of assembly was passed, authorizing *Abraham Witmer* to build a bridge over the *Conestoga*, and vesting the property thereof, when built, in the said *Abraham Witmer his heirs and assigns forever*, with permission to take toll at the rate fixed by the said act. But the legislature reserved a power when-ever it should seem expedient to them to make the said bridge a free bridge, to appoint three persons commissioners on the part of the Commonwealth, in conjunction with three others to be appointed by the said *Abraham Witmer* his heirs or assigns, who or any four or more of whom should estimate " what sum or sums of money the said *Abraham* " *Witmer* his heirs or assigns should be entitled to receive, " *as a compensation for his trouble and expenses in building* " *and maintaining the said bridge*, which sum or sums " should be paid to him or them out of the *treasury of the* " *Commonwealth.*" On the 4th *April* 1798, a supplement to this act was passed. The preamble recites that *Abraham Witmer* had represented to the legislature, that the bridge erected by him by virtue of the original act, having been built without a view to the turnpike road which was after-wards established, was not constructed of materials suffi-ciently durable, nor calculated to sustain the heavy burthens which were daily passing, and had prayed the legislature

to pass a law to authorize him to erect a bridge over the said creek, upon that permanent and extensive plan, which the importance of the situation required. It is then enacted that the said *Abraham Witmer* his heirs and assigns may build support and maintain a permanent bridge over the said creek, on any unoccupied part of the great road leading from *Philadelphia* to *Lancaster* immediately above and on the north side of his present bridge, and to take toll at the same rates as were established by the original act. The fifth section provides that whenever the legislature should deem it expedient to make the said bridge a free bridge, three commissioners should be appointed by the legislature and three by the said *Abraham Witmer* his heirs or assigns, who or any four or more of whom should estimate " what sum or sums of money the said *Abraham Witmer* " his heirs or assigns should be entitled to have and receive " *for his right and title in and to the said bridge*, which sum " or sums so estimated should be paid to him or them out " of *the treasury of the Commonwealth*." On the 2d *April* 1811, an act was passed giving to the commissioners of *Lancaster* county 10,418 dollars 34 cents, part of a debt due to the Commonwealth from the estate of *William Henry, to be applied towards payment for Abraham Witmer's bridge*. On the 17th *January* 1812, the commissioners of *Lancaster* county represented to the legislature, that a great majority of the county wished for a *free bridge*, that they had applied to *Abraham Witmer* who refused to deal with them, alleging that they had no authority to purchase. On the 27th *March* 1812, an act was passed " to purchase and make free " the bridge over the river *Conestoga* built by *Abraham Wit-* " *mer* in the county of *Lancaster*." By this act three commissioners were named on the part of the Commonwealth, who in conjunction with three others to be named by *Abraham Witmer* (not being citizens of *Lancaster* county) were to estimate on oath " *the sum* or *sums the said Abraham Wit-* " *mer his heirs* or assigns should be entitled to receive ac- " cording to the true intent and meaning of an act passed " 22d *September* 1787, and a supplement passed the 4th *April* " 1798, for the stone bridge across the *Conestoga* river, built " and owned by the said *Witmer*." The commissioners appointed by this act, having been notified by the commis-

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

sioners of *Lancaster* county, were to fix on a time and place of meeting, notice of which was to be given to *Abraham Witmer.* If four or more of these commissioners could not agree, the governor was to appoint a seventh person, and the sum awarded by a majority of these was to be paid to the said *Abraham Witmer* his heirs or assigns " *out of the* " *treasury of Lancaster county, by warrant drawn by the* " *commissioners of said county thereon.*" If *Abraham Witmer* should refuse to receive the compensation awarded by the commissioners, for ten days after tender thereof made to him by the county commissioners, he was to be debarred of the right of taking toll. If the sum awarded exceeded 10,418 dollars 34 cents, then the commissioners of *Lancaster* county, *after having paid the whole sum awarded*, were authorized to receive toll until they should be reimbursed the amount of what they had paid over and above the said 10,418 dollars 34 cents, after which the said bridge was to be free. *Abraham Witmer* having received notice from the commissioners of *Lancaster* county, named three commissioners on his part. The first commissioners met and made an award that the sum of 58,444 dollars 44 cents should be paid to *Abraham Witmer.* The commissioners of *Lancaster* county have refused to draw an order for this sum, and *Abraham Witmer* now applies for a *mandamus* to compel them.

Many objections are made to the issuing of this writ. The first goes to the jurisdiction of this Court, and is founded on an act passed 24th *February* 1806, by the nineteenth section of which it is enacted, that " *the Supreme Court shall* " *have no original jurisdiction in civil cases.*" Taking these words in their greatest possible extent, they might comprehend a *mandamus*, for it is an original writ applied as a remedy in a civil case. But to construe words in their largest sense, is not always to attain the intent of the legislature. At the time this law was passed, the Supreme Court were overwhelmed with business arising from civil actions commenced in the city and county of *Philadelphia.* Before the year 1786, no such actions were commenced in this Court, and it was judged proper to place its jurisdiction on the same footing that it formerly stood. This could produce no injury to the public, because the Common Pleas had jurisdiction of all *actions* which were forbidden to be

commenced in the Supreme Court. But it would have been productive of very ill consequences to take from the Supreme Court their jurisdiction in cases of *mandamus* and other writs of like nature, because the Common Pleas had no right to issue them, and thus there would have been a defect of justice on important occasions. By *civil cases* then is to be understood *civil actions*, which in common parlance do not comprehend writs of *mandamus, certiorari, habeas corpus*, &c. This was the construction put upon the act immediately after its passage and ever since. The jurisdiction has been repeatedly exercised and never before questioned. And upon one occasion it was expressly recognized by a resolution of the legislature, in which they directed that the Attorney General should appear in a case of *mandamus*, and support the right of the Commonwealth to a tract of land called the *mammoth farm* in *Luzerne* county. I have thought it proper to speak explicitly on the construction of the 19th section of the act of 24th *February* 1806, although that section is repealed by the 5th section of the act of 20th *March* 1810.

It has been urged further against issuing writs of *mandamus*, that this Court have no power to try an issue in fact out of the county of *Philadelphia*. This is true, and upon that principle the Court refused to grant an information in nature of *quo warranto* in the case of *the Commonwealth* v. *Smith* at *Pittsburgh*. But the case of *mandamus* is different from *quo warranto*. We may proceed to the end of it without trying any fact. The return to the first *mandamus* must be received as true, until it shall be proved false in an action for a false return, which may be brought in some other Court. If it contains matter sufficient to prevent a peremptory *mandamus*, the matter ends there for the present; if not, a peremptory *mandamus* issues.

Considering the objection to our jurisdiction then as groundless, we must examine the cause shown against the exercise of it in this particular case. We are called on to issue a mandamus, to compel the commissioners of *Lancaster* county to draw an order on the treasury for the sum of 58,444 dollars 44 cents. The commissioners say they ought not to draw the order, because there is not money in the treasury sufficient to answer it. No doubt they speak the truth,

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

1813.

COMMON-
WEALTH
_v._
COMMISSION-
ERS OF
LANCASTER
COUNTY.

and it appears to be cause insurmountable against issuing the writ. Whether the commissioners have done wrong in not taking measures to have the money placed in the treasury, is not now the question. If they have, we have no right to punish them in this way. What would it signify to draw an order on an empty treasury? The treasurer would refuse payment, and there the matter would end. We know very well that no money can come into the treasury but by a tax on the county; and that tax the commissioners cannot lay without the co-operation of other persons, even supposing that the act for the purchase of the bridge, authorizes the laying of a tax for the purpose of paying Mr. _Witmer_. If Mr. _Witmer's_ object be attainable by way of _mandamus_, the first step must be to order the proper persons to lay a tax; and it must be laid for _the whole sum at once_, for the act for the purchase of the bridge makes no provision for partial payments. There can be no apportionment of the toll; _Witmer_ is entitled to take it _all_ until he receives payment of the _whole sum awarded_. In short the payment of so large a sum does not seem to have been an event contemplated by the legislature; and whether this Court would think itself justified in compelling the county to raise it, without an act of assembly _explicitly directing it_, is a point on which I have not made up my mind. I recommend it to the serious consideration however, of Mr. _Witmer_ and his counsel, before another application is made to this Court. There are other important points which have been well discussed on the argument by the counsel on both sides, on which I deem it premature, at the present moment, to intimate any opinion.

BRACKENRIDGE J. No subordinate Court under the judicial system of this state ever had any power to issue a writ of _mandamus_. This King's Bench power is in the Supreme Court alone. The act of the legislature taking away the original jurisdiction of the Supreme Court, can respect only those powers which the subordinate Courts could exercise. With regard to these, the Supreme Court may or may not have original power as the legislature may from time to time direct; and in doing which they are not to be understood, as speaking of those powers which were never in any Court else to exercise. They are to be consi-

dered as having a reference to the jurisdiction of the Supreme Court, where by removal, appeal, or writ of error, they have cognizance, or may have it specially given to them in extraordinary cases, as co-ordinate with the Courts of inferior jurisdiction. The term *original*, or appellate, or of revision, has no relation to a province in which the Supreme Court alone ever had power. If under the term *original* these high powers stiled prerogative are taken away as is alleged, are they given in the first instance to the subordinate Courts? This not being the case, it must have been the intention of the legislature, according to a contrary construction, to annihilate all such powers in the judicial authority any where. This unless by express words can never be supposed to have been intended. I must therefore be of opinion that this Court, notwithstanding any seeming implication or general term in the act of assembly, retains its usual jurisdiction in these pre-eminent cases which no other Court can exercise. But an objection made to the exercise of this power in the present case, is, that as in the case of a writ *de quo warranto*, so here they may be stopped by the traverse of a fact, which from the present constitution of the Court, they have not the power to try. But in the exercise of the jurisdiction by *mandamus*, in contemplation of law no fact can be traversed, but the return must be taken as true. An action may lie for a false return, but not *on an issue to be directed by them;* so that there is nothing in this objection.

A second occurs which has relation to the common law, and takes away the remedy in this particular case. It is that the party applying for the *mandamus* has *another remedy*. It would seem to me that he has *by his own act*, and without application to the law; which is by keeping possession of his property, and he may sue the commissioners for damages for the trouble they have given him. This supposes that he may bring a suit against the commissioners even on the *award* itself to compel the performance of it. In this therefore he has another remedy. But to what purpose will it be for him to bring a suit, where the *interested* are judges? Such remedy may be considered as none. He is in no worse situation however than others are who have to do with commissioners, and this has never been given as an

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

1813.

COMMON-
WEALTH
*v.*
COMMISSION-
ERS OF
LANCASTER
COUNTY.

answer to all who have a right of action, and might with
equal reason apply to this Court for their extraordinary in-
terposition. But supposing this to be the case, with regard to
which, I will acknowledge that under the special circum-
stances I have not the most decided opinion, the issuing a
*mandamus* is discretionary in the Court; and it would seem
from the cause shewn by the commissioners, taking it to be
true, the principle of estimation of the sum awarded is not
correct, and according to the stipulations of the contract. It
is not the *fee simple right in the bridge* that is to be *pur-
chased*, but a privilege that is to be *redeemed* on paying the
expense and trouble in constructing it; and that would seem
to be what it cost at the time of erecting it, taking the
superintendance into view, making an allowance also for
the depreciation of the current medium for the present time.
If the real value of money *now* is to the *nominal* as one to
two, then give double of what the bridge cost at the time it
was built. But the highest toll of the bridge in any one year,
and such a principal as would produce the interest, would
seem to be an incorrect ratio of estimation. There is there-
fore a bar to the *discretion* of the Court in issuing a *man-
damus*, and the carrying this award into effect. I am there-
fore of opinion to refuse the writ.

Rule discharged.